Good morning, Justices. If it pleases the Court, I'm Mary Lou. We're judges, not justices. Old habits die hard. Well, I know, and I always make a tired joke, there's no justice in this Ninth Circuit. If not here, where? I think the first thing that has to come out of my mouth is an acknowledgement that the face of habeas world has changed after Harrington v. Reichter and Cullen v. Pinholster. Justice Alito said it best in his concurring opinion in Cullen that the whole thrust of AEDPA is to essentially to reserve Federal habeas review for those cases in which the State courts acted unreasonably. There's still a requirement for reasonableness under AEDPA review. Many more years ago than I want to remember, I started law school at Hastings, and there was a sign over the first-year books that said, Abandon all hope, ye that enter here. Well, I'm suggesting to this Court that there is not a sign over the Federal judiciary that says, Abandon all reason, ye that enter into AEDPA review. Here we have a defense attorney's fear that stops him from doing a proper investigation. And his fear of the defendant's what I call ghost prior was real, but it wasn't reasonable. And that's the standard that has to be met. If you look at the actual ---- That's not quite the standard. The standard is whether or not in an ineffective assistance of counsel case, A, whether counsel was reasonable, and then, B, whether the State court that reviewed it unreasonably adjudicated or judged the reasonableness. So you have two levels of reasonableness, and I'm afraid, as your opening acknowledged, the barrier on the second step, at least, has been made quite clearly high. I acknowledge that. Okay. But the reality is that this juvenile alleged prior did not exist. The district attorney at sentencing said to the Court, for all intents and purposes, it doesn't exist, period. The trial court made a factual finding on the record that it would not have been discovered. It didn't exist, period. It was a ghost. Are you saying factually it didn't exist or it wouldn't have been found in the records? It couldn't be proven. I don't know what the God's truth is. I don't know whether it existed or not, ever. But I know that it couldn't be proven. The district attorney said that multiple times. The trial court made that specific finding. There is absolutely no contradictory evidence in the record at all, period. Okay. It's also absolutely, unconditionally clear that once defense counsel found out that this prior could exist, he didn't look any farther. Now, I go to the same training programs that all other criminal defense attorneys go to in the State, and we're taught that you got a client accused of homicide, you get every single piece of paper on that person. You've got to find out what their intent is. And they're not likely to tell you if there's a history of mental illness in the family or history of head injury. You don't – they don't always tell you that. The last person in the world you rely on as an accurate fact teller is your client. You go get every single piece of paper. So, counsel, even if we agree with you that defense counsel's performance was below the standard of reasonableness, how was there any prejudice? Glad you asked. Why put on a phony defense when you have a real one? That's the prejudice. There was a real defense here. This was not a murder. This is a voluntary. But is it likely the real defense you're postulating would have resulted in a different outcome? Yes, given the facts of this case. Now, I'm the first one to acknowledge here that Mr. Allen was no angel. He had a history. But so did Mr. Bell. What was the real defense? I understand there were two defenses going here. One was perfect self-defense, self-defense itself. Right. And the other was alibi. Well, the alibi defense seemed to have been invented by the defense counsel because he admitted during the motion for a new trial that Mr. Allen had told him he was there at the scene of the crime. So how exactly this alibi defense came about is not real clear in the record, but a reasonable inference is that it was created by Mr. Sharif, or Sheriff, I think is actually how you pronounce his name. So that was and at the motion for a new trial, Mr. Sharif actually acknowledged it was a very dicey defense. It was very, he called it problematic at best. He never investigated the imperfect self-defense, which was the real defense here. You've got Deborah whipping up these men into a frenzy. It's in the record. She's with Mr. Bell in the morning and then Mr. Allen in the afternoon. And they're romantically involved with both of them and, you know, playing one against the other. So here you have a confrontation with two men, neither of whom are angels. But just because Mr. Allen isn't an angel doesn't mean he can't legitimately be in fear of Mr. Bell, who can be maybe not bigger, but certainly badder. And Mr. Allen's statement of what happened really has the ring of truth in that he said, yeah, Mr. Bell had the gun first, but then he took it from him. And after he had disarmed Mr. Bell out of what he called reflex, he shot him twice and killed him. So how would the trial have gone, in your view, if the attorney had proceeded in the way you maintain he should have? I think there's more than a reasonable probability. How would the trial have gone? Who would have been the witnesses and what would have been the evidence? The witnesses would have been Mr. Allen and the witnesses would have been Deborah to talk about the realities of her relationships with these two men and some of what she had said to both of them and the fact that she was, in fact, sort of, as I said, whipping them up, both of them. But wouldn't Mr. Allen's past have come into discussion as well, the firearm charges and the assault? But it's still, and what I'm saying is that, yes, even if that came in, Mr. Bell's history outweighed Mr. Allen's if you eliminate the ghost of the alleged prior. So he was convicted of second-degree murder. Right. And you're positing that he likely would have been convicted of what? Voluntary. It's a voluntary. It's the honest but unreasonable belief. He was not justified in shooting Mr. Bell after he had disarmed him. And he admitted he knew he was wrong and that that's why he left and left the scene. But he could have been convicted of first-degree murder, too. I mean, if the jury didn't like him as a witness and thought that because of his past record he was a he wasn't deserving of any leniency, so it's a crap shoot. I believe in the old adage, the truth shall set you free. I believe that putting on a defense that is true is infinitely preferable than putting on something that's phony. But we're looking at prejudice here, whether or not it's reasonably likely that the outcome would have been different in a good way. It is reasonably likely because Mr. Allen does not forego the right to defend himself just because he has a history. Both of these men have a history. Both of these men who are who they are, but they still have the same rights. We're not disagreeing with you on that. The question is whether or not it was reasonable for defense counsel to make the judgment call that he shouldn't pursue that avenue. He can't make that judgment call unless he investigates and he knows exactly what he's dealing with. You can't make a tactical decision until you know all of the factors. And given the... So you think the tactical decision turns solely on whether the ghost history would be part of the history? I think that he should have known that he needed to look further once the DA offered this stipulation that seemed awfully good to be true. This was one of those things where the DA, oh, wow, the DA is going to give me this great stipulation at trial. Gee, isn't that wonderful? I think as defense counsel, I've got to ask, why are they being so generous to me all of a sudden? Okay. Thank you. I'll give you a minute for a follow-up. Good morning, Your Honors. Good morning. I'd like to begin with... Do you want to introduce yourself? I apologize. Deputy Attorney General Michael DeLitta from the California State Attorney General's Office on behalf of Respondent Annapelle. As counsel admitted, Harrington v. Richter has changed the landscape in these type of claims. And I just want to emphasize, as this Court mentioned, there's double layers of reasonableness that need to be addressed here. And as Richter says, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard. That clearly happened in this case here. What clearly happened? That the representation of defense counsel was clearly satisfied Strickland's requirements. It was not deficient. Number one, it was not deficient. And number two, there clearly was no prejudice. I'd like to address this, quote, ghost record of Petitioner. There is evidence in the record that he was convicted of a juvenile homicide in 1978. There's testimony from defense counsel that Petitioner himself told the investigator, Mr. Von Gelderen, of this juvenile adjudication. There is also a letter in the record from a CIA supervisor, Dominic Hatfield, which specifically describes this conviction which happened in L.A. County. Petitioner was committed to CIA on October 12, 1978, for first-degree murder. So it's not a ghost. It's real. Why the prosecutor wasn't aware of it, I don't know the answer to that. But it's real, and the record establishes that. In addition, Petitioner also, from the probation report, it indicated that he had been convicted of assault with a deadly weapon, stabbing someone with a knife. He had been convicted of battery with serious injury. That was in 1987. He was convicted of battery with serious injury in 1991. He was also allegedly involved in a drive-by shooting. And there were four separate convictions for unlawful possession of a firearm, as well as property crimes and drug crimes. This is a record. Did Mr. Sheriff, the counsel, there was a hearing on this, was he not? That's correct. He explained his thinking. Did his thinking turn on the tipping point where he decided to opt for the alibi approach? Was that totally based on the risk of the juvenile first degree coming forward? That was a big – it wasn't just that. That was obviously a big issue. What did he say? What he said was he knew his client's background was problematic. In fact, this is what he said. This was his quote. If I got into a volley with a prosecutor over respective records, Petitioner was going to suffer. He had looked at Bell, the victim's rap sheet. He knew that Bell had a violent history, but he knew his client's history was just as bad or worse, and he didn't want to get into that battle of records. According to counsel's argument is actually Bell, you take out the so-called ghost conviction, then in the balance Bell's was worse, and therefore that was a better approach, the only reasonable approach because it was true and there was no basis for an alibi defense. Well, I respectfully disagree with that, Your Honor. As I've indicated, there was more than just this – and I don't want to refer to it as a ghost conviction because – No, I'm just using it as a shorthand for now. I understand that. But I mean, there was more than just that. There were all these other incidents which I've talked about, which was part of his analysis as to why he – as if he knew the rap sheet, he knew that Bell had a bad criminal history. What was the basis for the alibi defense then? It came from Petitioner himself. And as counsel testified during the new trial motion, it's not uncommon for clients to lie, and his story evolved over time from he was not there, he was at a bar, to he was there but someone else did it, to finally he was there and he shot him in self-defense. Counsel knew the latter before he actually went to trial on that defense? You know, Your Honor, I'm not positive at what point – I know that it was – there were two trials in this case, and I don't believe he knew before the first trial, but I'm not positive whether he knew before the second trial or not. I don't believe that's the case because I don't – that's not a defense whatsoever. But more important than just knowing the records of the two individuals, he entered into a stipulation, a fantastic stipulation from his perspective with the prosecution that indicated that his client hadn't been involved and hadn't been convicted of any violent crimes while on parole or probation. That was fantastic because he was allowed to – the main thing is he didn't want his client's reputation, his record out there in front of the jury. The prosecution agreed to not mention it. Yet he was still able to talk about Bell's bad character through the testimony of Deborah, who testified that Bell was violent with her and she was afraid of him. So Bell's violent conduct, evidence was there without having to get into his client's record, which is what he was trying to protect the entire time. And again, we're not here to judge whether or not he made the best tactical choice, although the courts that have reviewed this seem to indicate that he did make the best tactical choice. In the briefing, it seemed to indicate that the district court and the California appellate court both found that it was deficient performance in not seeking those records. That's inaccurate. The district court and the California appellate court both found that there was no error and there was no prejudice. The only court that found that it was deficient performance was the trial court, who then said, but it was clearly out – there was clearly no prejudice and, in fact, said that he was lucky. He could have been convicted of first-degree murder instead if he'd gone the other way. Okay. Thank you. If this Court has any other questions, we're willing to submit at this point. All right. I'll give you a minute if you want to respond. As far as the deal that the prosecution offered, my mama taught me that if somebody offers you something too good to be true, it probably is. This one was. I'd submit it, Justices. Thank you. All right. Thank you, counsel. We thank you for the argument. The case is submitted.
judges: Fisher, Rawlinson, Cjj Timlin (C. Cal.), Dj